# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-40040-FDS

**JOSE M. CASTILLO,**
Petitioner

v.

**STEVEN O'BRIEN**
Respondent

## Petitioner's Legal Memorandum in Support of Petition

The petitioner Jose M. Castillo (hereinafter "Castillo") was tried and convicted in September, 2000, for indecent assault and battery on a child under 14 (Massachusetts General Laws c.265, §13B) and indecent assault and battery on a person 14 or over (Massachusetts General Laws c.265, §13H). His trial and the convictions occurred in the Massachusetts Superior Court, Worcester County Division. He was sentenced to 5-7½ years at M.C.I., Cedar Junction for the §13B (under 14) conviction and 4-5 years, concurrent, for the §13H (over 14) conviction. He filed a timely notice of appeal from his convictions. (Respondent's Supplemental Answer, Item 3, pages 12-15).

14

On October 18, 2000 Castillo filed in the Worcester Superior Court a motion for a new trial. A non-evidentiary hearing on this motion was presided over by the trial judge, Bohn, J., on December 19, 2001. Judge Bohn denied the motion on November 4, 2002. The defense then filed another timely notice of appeal. (Respondent's Supplemental Answer, Item 3, pages 17-30).

The case was docketed in the Massachusetts Appeals Court on February 24, 2003. On April 29, 2004 the Appeals Court denied the defendant's appeal and affirmed the judgment, in a Memorandum and Order pursuant to its Rule 1:28. The petitioner's case is reported at 61 Mass. App. Ct. 1102, 807 N.E.2d 252 (2004) and is included in the Respondent's Supplemental Answer at Item 5. The petitioner applied for further appellate review to the Massachusetts Supreme Judicial Court, but this application was denied. (Respondent's Supplemental Answser, Items 6 & 7).

In February, 2005 Castillo filed his Petition for a Writ of Habeas Corpus. The issues were joined and Castillo now files his Legal Memorandum in Support of the Petition for a Writ of Habeas Corpus

## STATEMENT OF THE FACTS

## Pretrial Publicity About The Missing Baby Case

The publicity in this case was extensive. More significant, however, was the fact that nearly every article that mentioned the petitioner by name included a reference to a widely publicized and sensational missing baby case and to the petitioner's status as the baby's former foster father. (Respondent's Supplemental Answer, Item 3, pages 49-86, 88-127, 129-136, 139-142). A sample of these many articles includes the the following:

> Mr. Castillo is the former foster father of Marlon Devine Santos, who was 5 months old when he disappeared Nov. 5, 1998, from the Eastern Avenue home of Mr. Castillo and his wife, Yolanda. A special grand jury has been convened to look into the disappearance.

> Worcester Telegram & Gazette, August 17, 2000. See Respondent's Supplemental Answer, Item 3, page 139.

The local publicity that preceded and led up to the defendant's trial included references to an alleged conviction for drug distribution in Florida (Respondent's Supplemental Answer, Item 3, page 49), references to the defendant's prior criminal record (id @ 69-70) and repeated references to the missing baby case (id @ 50-68, 73-76, 88-115)

The petitioner repeatedly sought a change of venue. His first motion

3

for a change of venue was heard by the Superior Court, Sosman, J. presiding[1], on November 18, 1999. Justice Sosman denied the motion, but with reservations:

- "The problem that I have, or that I think the trial judge would have, is that the thing for which this defendant is now somewhat notorious in terms of publicity is not this set of charges that is about to be tried."

- "(H)ow is someone going to ask this panel who is going to be hearing a case about sexual assault...: 'Well, have you read about this defendant's involvement with a missing baby?' without putting in mind ... during the course of the trial ... that (this is) the guy who is suspected in this missing baby case?"

- "How would I, or any other trial judge, impanel a jury in this county that would eliminate that problem?"

- "My inclination would be to grant this motion for change of venue while a cloud of suspicion hangs over this defendant's head in regard to the Marlon Santos case, and that suspicion is voiced broadly in the press, the local press, the way it is."

- "I think that the difficulties of impanelling a jury on these sexual assault charges here in Worcester are quite severe and would put the defendant in a very, very difficult position and a very difficult strategic position in terms of how to handle that during impanelment."

- "The dangers of trying to examine jurors about it are so great that it becomes quite a quandary. ... (T)hose dangers are a great deal less if you do the trial somewhere else. You might much more safely decide that you would not want the panel questioned about the Marlon Santos matter..."

---

1 Justice Sosman was appointed to the Massachusetts Supreme Judicial Court on September 6, 2000.

- "I don't think the defendant should be put in that difficult position when it can be solved by change of venue."

(Petitioner's Amended Petition, Pretrial Transcript 11.18.99, pages 12-29)

Despite these comments, and notwithstanding the continued media references to Castillo and the "Marlon Santos missing baby" case, further defense efforts to seek a change of venue were not successful.

(Respondent's Supplemental Answer, Item 3, pages 46-47).

## Individual Voir Dire Questioning About The "Marlon Santos Missing Baby" Case

The trial court also refused to inquire of the prospective jurors whether they were aware of the fact that "Jose Castillo" and the "Marlon Santos foster father" were the same individual. This was essential voir dire questioning, in view of the defendant's notoriety stemming from his connection to the missing baby case. The prospective jurors did not necessarily know "Jose Castillo". But they most likely knew about the "Marlon Santos missing baby" case. The petitioner was entitled to have the prospective jurors know about his notoriety before they were asked if they could remain partial. The two questions were designed to accomplish this:

- "There has been extensive media coverage involving this Defendant and the missing "Marlon Santos" baby case. Have you read or heard anything in the media about the missing Marlon Santos case?

- Does this fact make you question your ability to be fair and impartial in listening to the testimony in this trial?"

(Respondent's Supplemental Answer, Item 3, pages 144-145; Respondent's Supplemental Answer II, Item 3, Trial Transcript Volume I, 9.14.2000, pages 4-8).

## ARGUMENT

**The Petitioner Was Denied His 6th Amendment Right To An Impartial Jury And His 14th Amendment Right To Due Process When The Trial Court Repeatedly Denied His Motion For A Change Of Venue And Then Refused To Inquire Of The Prospective Jurors Regarding The Unrelated – And Highly Publicized - Investigation Of A Missing Foster Baby.**

### I. Standard Of Review: The Petitioner Is Entitled To A "De Novo" Review Of His Federal Constitutional Claims.

The petitioner's claims were not "adjudicated on the merits in (the) State court proceedings" and are thus subject to a *de novo* review by the Federal Court. These claims are advanced pursuant to 28 U.S.C. §2254, entitled the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). "AEDPA's strict standard of review only applies to a 'claim that was adjudicated on the merits in state court proceedings.' 28 U.S.C. §§ 2254(d)." Fortini v. Murphy, 257 F.3d 39, 47 (2001).

In the present case the state Appeals Court disposed of the petitioner's appeal pursuant to its Rule 1:28 which provides in pertinent part as follows:

"At any time following the filing of the appendix ... and the briefs ... a panel of the justices of the (Massachusetts Appeals Court) may determine that no substantial question of law is presented by the appeal ... and may, by its written order, affirm ... the action of the court below ..." Massachusetts Appeals Court Rule 1:28 (emphasis added).

The Massachusetts Supreme Judicial Court (SJC) then denied the petitioner's application for further appellate review. (Respondent's Supplemental Answer, Items 6 & 7). No Federal authority was cited by either state appellate court. For these reasons the petitioner contends that his Federal constitutional claims were not "adjudicated on the merits in (the) State court proceedings", and are thus subject to a *de novo* review by this court. See <u>Gruning v. Dipaolo</u>, # 02-1341 (1st Cir., 11/15/2002).

## II. Standard Of Review Under The Antiterrorism And Effective Death Penalty Act, 28 U.S.C. § 2254("AEDPA")

If it is concluded that the petitioner's claims are governed by the habeas corpus statute, 28 U.S.C. §2254, entitled the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the follwing standards will apply. The habeas corpus statute provides that "(a)n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on

7

the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" 28 U.S.C. §2254(d).

> AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." Williams v. Taylor, 529 U.S. 362, 412 (2000). Under the statute, "(the court) focus(es) the lens of (its) inquiry on the state . . . court's decision and ask(s) whether the court's application of the analytic framework dictated by the relevant Supreme Court precedents was objectively unreasonable" or contrary to that law. See Williams v. Matesanz, 230 F.3d 421, 427-28 (1st Cir. 2000).

> AEDPA's "contrary to" and "unreasonable application" clauses yield two separate categories of analysis. (citations omitted). A state court decision is "contrary to" federal law as determined by the Supreme Court, and so may be set aside on federal habeas review, if it "applies a rule that contradicts the governing law set forth in (its) cases" or "confronts a set of facts that are materially indistinguishable from a decision of (the Supreme Court) and nevertheless arrives at a result different from (its) precedent." Taylor, 529 U.S. at 406.

> Alternately, a state court decision may be set aside as an "unreasonable application" of federal law as determined by the Supreme Court "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from (the Supreme Court's) precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new

8

context where it should apply." Id. at 408. In defining an unreasonable application of federal law, the Court said that "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410 .... Thus under AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Mountjoy v. Warden, 245 F.3d 31, 35 (1st Cir. 2001).

"A state-court decision contravenes the 'unreasonable application' criterion when, though it correctly identifies the pertinent United States Supreme Court rule, its application to the particular facts of the case at bar is objectively unreasonable." Correia v. Timothy Hall and Thomas Reilly, 364 F.3d 385 (1st Cir. 2004). "The focus of the ... inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable ... an unreasonable application is different from an incorrect one. ..." Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843 (2002).

### III. Basic Legal Principles: There Is A Body Of Clearly Established Constitutional Law, As Determined By The Supreme Court, Governing A Defendant's Right To Be Tried By A Fair And Impartial Jury And This Case Is Controlled By This Set Of Clearly Established Principles.

The Supreme Court cases of Irvin v. Dowd, 366 U.S. 717 (1960), Rideau v. Louisiana, 373 U.S. 723 (1963), Estes v. Texas, 381 U.S. 532 (1965), Sheppard v. Maxwell, 384 U.S. 333 (1966), and Groppi v.

Wisconsin, 400 U.S. 505 (1971), as well as the cases of Turner v. Murray, 476 U.S. 28 (1986), Ham v. South Carolina, 409 U.S. 524 (1973), Aldridge v. United States, 283 U.S. 308 (1931), Morford v. United States, 339 U.S. 258 (1949), and Morgan v. Illinois, 504 U.S. 719 (1992) establish clear principles that were not adhered to by the Massachusetts trial court in this case when it repeatedly denied the petitioner's requests to change the venue of the trial.

The Court in Irvin v. Dowd, 366 U.S. 717 (1960) vacated a state court judgment in view of the "continued adverse publicity (that) caused a sustained excitement and fostered a strong prejudice among the (local community)." 366 U.S. @ 726. The Irvin case involved a series of murders that were "extensively covered by news media in the locality, (arousing) great excitement and indignation throughout the (region)." 366 U.S. @ 719. The Court, in Irvin, recognized the strong prejudice against the defendant that "was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box." Id @ 727.

In Rideau v. Louisiana, 373 U.S. 723 (1963) the Court reversed the conviction of a man who was tried after he was interviewed and confessed, on television, while incarcerated awaiting trial. The Court, in Rideau, concluded that the defendant had been denied due process of law when the

trial judge refused a request to change the venue in the wake of "Rideau personally confessing in detail to the crimes with which he was later to be charged." 373 U.S. @ 726. "(D)ue process in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview'" Id @ 727.

The Supreme Court, in <u>Estes v. Texas</u>, 381 U.S. 532 (1965) reversed the criminal conviction of a man because he was denied due process by the televising and broadcasting of his trial. "Massive pretrial publicity ... had given (the case) national notoriety." 381 U.S. @ 535. The Court, in <u>Estes</u>, quoted Justice Holmes as follows: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." 381 U.S. @ 551, quoting <u>Patterson v. Colorado</u>, 205 U.S. 454, 462 (1907).

In <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966) the Court reversed the conviction of a man charged with the 2nd degree murder of his wife, based on the trial court's "failure to protect (the defendant) sufficiently from the massive, pervasive, and prejudicial publicity that attended his prosecution." 384 U.S. @ 335. The Court, in <u>Sheppard</u>, stated that "freedom of discussion ... must not be allowed to divert the trial  from the 'very purpose of a court

11

system ... to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures' (citation omitted). Among these 'legal procedures' is the requirement that the jury's verdict be based on evidence received in open court, not from outside sources." 384 U.S. @ 350-351.

In Groppi v. Wisconsin, 400 U.S. 505 (1971) the Court considered a Wisconsin statute that prevented a change of venue for a jury trial in a criminal case solely on the ground that the crime was a misdemeanor, and held that such a statute violated a defendant's right to a trial by an impartial jury guaranteed by the Fourteenth Amendment. The Court again recognized the essential nature of an impartial jury and identified different ways to preserve the concept: "There are many ways to assure the kind of impartial jury that the Fourteenth Amendment guarantees. ... Here we are concerned with the methods available to assure an impartial jury in a situation where, because of prejudicial publicity or for some other reason the community from which the jury is to be drawn may already be permeated with hostility toward the defendant. ... One way to meet the problem is to grant a continuance of the trial ... Another way is to provide a method of jury qualification that will promote, through the exercise of challenges to the venire – peremptory and for cause – the exclusion of prospective jurors

infected with the prejudice of the community from which they come. ... "
400 U.S. @ 509-510. The Court in Groppi then cited its Rideau decision
and stated that "(o)n at least one occasion this Court has explicitly held that
only a change of venue was constitutionally sufficient to  assure the kind of
impartial jury that is guaranteed by the Fourtenth Amendment." Id @ 510.

As earlier stated, the impact of the trial court's refusal to change the
venue of the petitioner's trial in this case was exacerbated by its refusal to
pose two of the petitioner's requested voir dire questions. The Supreme
Court has reversed lower court judgments when a trial court has declined to
ask requested voir dire questions. Several of these cases have involved the
issue of racial prejudice. See Turner v. Murray, 476 U.S. 28 (1986), Ham v.
South Carolina, 409 U.S. 524 (1973), and Aldridge v. United States, 283
U.S. 308 (1931).

In Morford v. United States, 339 U.S. 258 (1949) the Court granted a
petition for a writ of certiorari because the trial court refused to permit a
question to prospective government employee jurors about the "Loyalty
Oath", so-called. In Morgan v. Illinois, 504 U.S. 719 (1992) the Court
reversed a murder conviction because the trial court refused to ask a voir
dire question whether any prospective jurors would automatically vote to
impose the death penalty, regardless of the facts.

13

In these and other cases the Court has underscored the essential nature of an adequate voir dire. "(P)art of the guaranty of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan v. Ilinois, 504 U.S. @ 729. "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. ... (L)ack of adequate voir dire impairs the defendant's right to exercise peremptory challenges ..." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). "(I)t would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." Aldridge, 283 U.S. @ 314-315.

Other Supreme Court cases that speak to the issue of adverse pretrial publicity do not appear to support the petitioner's position, but these cases can be distinguished. These cases include Mu'Min v. Virginia, 500 U.S. 415 (1991), Patton v. Yount, 467 U.S. 1025 (1984), Beck v. Washington, 369 U.S. 541 (1962), and Murphy v. Florida, 421 U.S. 794 (1975). In Mu'Min

14

the Court affirmed a state court judgment of conviction in a murder case that had engendered massive pretrial publicity. The Court determined that the voir dire examination that was conducted in <u>Mu'min</u> was not perfunctory and adequately covered the topic of the pretrial publicity. 500 U.S. @ 431-432. The prospective jurors in <u>Mu'min</u> certainly knew who the defendant was, unlike the case at bar.

In <u>Patton</u> the Court reinstated a state court murder conviction, ruling that the voir dire questioning and the record of publicity did not reflect an adequate sense of notoriety or outrage to warrant a conclusion that the defendant did not receive a fair trial. Once again, the voir dire questioning demonstrated that the venire knew who the defendant was, i.e. that he was the same man whose earlier trial had been extensively covered in the media. Since this previous trial had occurred four years earlier the Court concluded that the passage of time had allowed for the "softening or effacing" of the public passion that the jurors may have formerly had against the defendant. 467 U.S. @ 1033-1035

In <u>Beck</u> the Court affirmed a state court conviction for larceny despite extensive adverse publicity in the Seattle, Washington area where the defendant was tried. The Court determined that the adverse publicity was neither intensive nor extensive. More importantly, the prospective jurors

15

knew who the defendant was so that they were able to make a more informed response to a question whether they could remain impartial: "a study of the voir dire indicates clearly that each juror's qualifications as to impartiality far exceeded the minimum standards this Court established in its earlier cases..." 369 U.S. @ 557.

Finally, in <u>Murphy v. Florida</u>, 421 U.S. 794 (1975) the Court again affirmed a state court conviction despite a defense challenge based on adverse publicity that included descriptions of the defendant's prior criminal record. The Court concluded that the voir dire questioning in <u>Murphy</u> was adequate: "(t)he voir dire in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." 421 U.S. @ 800.

### IV. Application Of Controlling Principles To The Relevant Facts

The state appellate court stated that "there was no showing that the defendant could not receive a fair trial." (Respondent's Supplemental Answer, Item 5). Justice Sosman, then presiding as a Superior Court Justice, did not appear to share this opinion, as evidenced by her comments when she presided over the first hearing on the petitioner's motion for a change of venue. It was not so much the fact that there had been news items about the

16

pending charges, but rather the fact that there had been a consistent linking of Mr. Castillo to the "missing baby" case. The publicity was extensive and emotional. Nearly every article that mentioned the defendant by name included a reference to the missing baby case and the defendant's status as the baby's former foster father. "(T)he force of (the) continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of (Worcester) county." Irvin, 316 U.S. @ 726.

The local publicity continued up to and through the trial and was not limited to the print media. (Respondent's Supplemental Answer, Item 3, pages 49 – 142). The media coverage linking the petitioner to the missing baby case "could only have impressed (the jurors), and also the community at large, with the notorious character of the petitioner..." Estes, 381 U.S. @ 536. The defendant was forced to defend himself in a county that was consumed by an overriding concern: "What happened to the foster baby Marlon Santos?"

The Massachusetts appellate courts overlooked the unique feature of Castillo's adverse publicity claim: the publicity stemmed from and underscored his status as the foster father of the missing baby. Justice Sosman, in her comments from the bench on November 18, 1999, recognized and acknowledged this unique feature:

17

- "My inclination would be to grant this motion for change of venue while a cloud of suspicion hangs over this defendant's head in regard to the Marlon Santos case, and that suspicion is voiced broadly in the press, the local press, the way it is."
...

- "The dangers of trying to examine jurors about it are so great that it becomes quite a quandary. ...

- "I don't think the defendant should be put in that difficult position when it can be solved by change of venue."

(Petitioner's Amended Petition, Transcript 11.18.99, pages 12-29)

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." Patterson v. Colorado, 205 U.S. 454, 462 (1907). "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." Offutt v. United States, 348 U.S. 11, 13 (1954).

The trial transcript shows that juror partiality, bias and prejudice was present in this case. Before the individual voir dire questioning began three prospective jurors gave responses that suggested that they might know or know of the defendant. Two of these individuals had Hispanic surnames. The third was a school adjustment counselor who was later excused for cause because of what he had read in the media about Mr. Castillo.

18

(Respondent's Supplemental Answer II, Item 3, Trial Transcript Volume I, 9.14.2000, pages 48-49, 57, 64, 114).

The court questioned 42 prospective jurors individually (id @ 67-156). Thirty one of them were found to be indifferent (id @ 157). Twenty five of these 31 responded that they had read or heard nothing about "Mr. Castillo".

Seven of the original 42 prospective jurors responded that they may have read or heard something about Mr. Castillo: "I know about the sexual assaults that we read in the paper, and I think it was the … he had the little boy, the baby that was kidnapped out of his home" (id @ 72); "I read a lot about it in the paper … I may have the case wrong. I think it was … (t)here was a baby that was abducted, and then shortly after those charges then all of these charges came out. And I have children and I think I have some opinions of my own about child abuse issues." (id @ 80-81); "I did read the articles in the paper at the time." (id @ 100); "I heard the news on the television, Channel 3 once… (id @ 135); "I am not sure … I may have … The name sort of rings a bell…" (id @ 139); "I read something in the Telegram … the baby was missing and he sold socks from Spag's (id @ 141); "I might have read something, but I am not sure. Was it in the paper?" (id @ 152). Only one of these seven respondents was excused (id @ 80-81).

19

Only two of the 42 prospective jurors were certain that they had read or heard of Jose Castillo. Each was excused for cause. Juror 3-4, Richard Dymek, was, at first, uncertain if he had read or heard anything about the case. When he was told for certain that this was the case "with the gentleman who was also a minister", he confessed a bias, and he was excused (id @ 95-96).

Juror 4-6, John Sullivan, Jr., was clear that he had read or heard about the defendant. He recalled in some detail what he had read. When asked if he could still decide this case on its own merits, Mr. Sullivan said that he couldn't forget what he had read and that "(i)t would color (his) judgment and influence what (he) thought." Mr. Sullivan was excused for cause (id @ 114).

Only one juror in each of panels I, II and III may have read or heard something in the media about Jose Castillo. By contrast, four prospective jurors in panel VI may have read or heard something about Mr. Castillo. (id @ 133-150). There apparently were some discussions among the jurors, outside the courtroom, and concerning the issue of media coverage: Juror 3-2, when asked if she had read or heard anything about the defendant, responded "No. I can honestly say that. Someone asked me upstairs and I said no, I did not." (id @ 90).

20

The Appeals Court concluded that there was no "showing on appeal that the defendant did not receive ... a (fair) trial." The responses of the prospective jurors, however, demonstrate that the "cloud of suspicion" remained an important feature of this case. These jurors suspected, inferred, informally learned or re-learned about the defendant's notoriety and the reasons for this notoriety. Adequate measures were not taken to ensure that all jurors - and not just Messrs. Dymek and Sullivan - were excused because of their inability to be impartial in the face of the defendant's status as the "Marlon Santos" foster father. The judge assumed, incorrectly, that by simply telling the jurors the defendant's name they would know that he was the foster father in the notorious "Marlon Santos" missing baby case. Had the jurors also been asked about their awareness of the "missing Marlon Santos Baby" case, more of them, in all likelihood, would have confessed partiality. Given the extent of the publicity about this missing baby case, such inquiry was essential to preserve any chance for Mr. Castillo to get a fair trial in Worcester County.

The procedure followed by the trial court in conducting its voir dire of the prospective jurors did not adequately cover the subject of the "missing Marlon Santos baby" case, about which this defendant had become "somewhat notorious in terms of publicity...". The requested voir dire

questions would not have "created a problem where there was none," because at least one of the deliberating jurors already knew that the defendant was the foster father in the sensational missing baby case.

The Supreme Court has written that it "think(s) that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." Aldridge v. United States, 283 U.S. 308, 315 (1931). The only county in Massachusetts where the petitioner could not have received a fair trial was Worcester. It was in this county that the extensive publicity about the "missing baby" case was concentrated. Furthermore, the petitioner's voir dire questions should have been asked. It was error to refuse to change the trial venue and further error to refuse to pose the requested voir dire questions.

This error can not be deemed harmless. "(S)ome constitutional errors require reversal without regard to the evidence in the particular case. ... Harmless-error analysis ... presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." Rose v. Clark, 478 U.S. 570, 577-578 (1986).

## Conclusion

For all of the foregoing reasons the petitioner respectfully prays that an order enter that a writ of habeas corpus issue forthwith.

Respectfully submitted,
JOSE M. CASTILLO
by his attorney

James W. Rosseel, Esq.
P.O. Box 7294
Worcester, MA  01605
(508) 856-9444
BBO# 430400

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

## CIVIL ACTION NO. 05-40040-FDS

### JOSE M. CASTILLO,
Petitioner

v.

### STEVEN O'BRIEN
Respondent

## CERTIFICATE OF SERVICE

I, James W. Rosseel, Esq., hereby certify that on July 22nd, 2005, I served a copy of the Appellant's Memorandum and Motion to File Memorandum *Instanter* on the following parties by way of the U.S. Mail.

Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1598
att'n: Eva M. Badway, Ass't Attorney General

Date: 7/22/05

James W. Rosseel, Esq.